May it please the court, my name is Natasha El-Sergany on behalf of the Northwest Immigrant Rights Project for the petitioner Pavel V. Bahmatov. I will seek to reserve two minutes for rebuttal. Mr. Bahmatov, a former refugee in open violation of Uzbekistan's illegal entry and exit laws, faces immediate arrest and detention at the airport immediately upon arrival in Uzbekistan if he's deported. And as the agency found, the Uzbekistan authorities will torture him once he's in detention. The agency committed both factual and legal error in its decision that it is unlikely that Mr. Bahmatov would even be arrested. First, the agency found credible, testified that Mr. Bahmatov is 99% likely to be detained immediately upon arrival at the airport. Now, is that because he didn't comply with the exit entry requirements? Yes, your honor. Or is it because he would be removed out of the United States when he gets there, they'll know that he's, you know, apparently in order to get a travel visa, they'll have to produce the, what is it, 213 or whatever it is. They'll then know that he had been convicted of a crime, a serious crime. And so what did the expert testify to? The expert testified that he has this 99% risk of being immediately pulled into secondary inspection, detained, and interrogated, at which point he would already be subject to torture. And the factors that she found would get him into detention would be, the first red flag would be that he is stateless, so he doesn't have any documentation. So they would immediately pull him aside for that. And even the IJ found that from his I-213, the Uzbekistan government is going to be aware prior and definitely immediately upon entry that he has this heavy criminal conviction and that he also violated the illegal exit laws. And that he is a former refugee who previously complained about the government of Uzbekistan. So these are all factors that would be immediately apparent to the Uzbekistan government. And we can see from the record how the Uzbekistan government treats forcibly returned asylum seekers, which is a highly analogous example. At the record at 763, it shows that between January 2015 and July 2016, over 500 people were forcibly returned, abducted actually from other countries with the cooperation of the Russian Secret Service, and brought back to Uzbekistan where they were interrogated, forced to confess to anti-state crimes, and tortured. Now the immigration judge minimized that highly probative and potentially dispositive evidence by stating that there were a dozen people who returned in this capacity, but it was actually over 500. So in failing to look at the actual consequences for people similarly situated to Mr. Bamatov, she committed an error that this court's found in Colvie-Holder is not permissible. It's not permissible for the judge to speculate in the face of unrebutted evidence. So did the IJ factor in the problem with the exit entry documents? Lack of such documents. Your Honor, she did mention it in her decision, but when it came to her primary analysis about why he wouldn't be subject to a more likely than not risk of torture, her chain of events test that she posited was that first they would be aware that he was stateless, that second they would be aware that he's stateless, a criminal deportee who spent a long time in the United States, and he's a she didn't include in those factors the exit visa violation. So even though she found if he's detained for those factors, he would be tortured, she found that he wouldn't be arrested, but she didn't meaningfully contend with that evidence that said once he gets to the airport, he's immediately facing the body that he says is going to torture him and presenting these factors that he would be arrested for. So in doing so, the judge failed to just contend with the actual reality on the ground that he would face at the airport. I just have a side question, not related to the record, but is he in custody? He is, Your Honor. He's been in custody since he's 15 years old, and he's now about 28. Is it likely that Uzbekistan will issue a travel visa even to begin with? During the hearing, the IJ did ask the government to try to obtain a travel document, and there was no affirmative response to that. So it's not very clear what the actual possibility of him getting the travel document is, given that he's stateless. Well, the United States needs to obtain a travel document for him before they can remove him to Uzbekistan, is it? Yes, and in order to do so, they'll need to ask him, or they'll need to present his Form I-213 to the government of Uzbekistan. So it's possible the expert testified that he could obtain a travel document, but it's not, it doesn't say that he'll have some kind of permanent status when he gets there. I read that. So if Uzbekistan won't issue a paper to let him be sent back there, what happens to him? Well, in that case, he has the option to try to get out of detention on federal habeas relief, but the case before us today is what is his likelihood of torture if he is returned, and that's the only, just looking at those factors that he presents when he arrives in Uzbekistan, that's the only way that we can decide whether or not he's eligible for deferral under the CAT, is to decide whether or not, it's more likely than not, that once he is deported, he would be tortured. So if we thought the record showed a clear probability of torture upon return, then the petition should be granted, and it would be up to the agency whether they want to try to send him somewhere else. Yes, Your Honor, and... They could always try and send him someplace else, correct? They just need to get a travel... So, for example, they could try and send him to Russia. Russia will take him. Well, he doesn't have any connection to Russia, Your Honor, so... How about Tajikistan, which is right next door? He is stateless, so he doesn't have any status in any country. Either Uzbekistan or he remains here. Yes, Your Honor. Let me ask you this. If you prevail here, at some point, does he get a bail hearing? He has had a bond hearing and been denied, Your Honor, yes. Has he ever become eligible for another bond hearing? He... No, Your Honor, that was... So then the only thing left is a writ of habeas corpus? Yes, Your Honor. Okay, thank you. Thank you, I'll reserve the rest of my time. Okay, thank you, Your Honor, and may it please the Court, Joseph Hardy for the Attorney General. Your Honor, substantial evidence supports the IJA and the Board's denial of the claim for deferral of removal under the Convention Against Torture. And I know it wasn't talked about just now, but also the denial of the motion to remand during the pendency of the administrative appeal. As far as the cat claim, Your Honors, I would say that the IJA properly found that while the evidence established that the Uzbek government admittedly does engage in torture in its prison systems, there was no evidence that petitioner was likely to be placed in detention upon return to the country. I'm only speaking for myself, and I read this record very carefully, but I don't quite understand how the IJA reached that conclusion. And I understand that Judge Piazza... If you read the expert's opinion, her testimony, it's really compelling. And the IJA found her credible. And yes, she did, Your Honor, and I would point out this. The expert's testimony, what she testified to wasn't particularly that he would be placed in detention. For example, as far as the criminal deportee status, she stated that that factor would subject him to special supervision from the government. It wasn't necessarily that he would be placed in detention. I know she mentioned, for example, that the government tends to... And even then, that was just as far as the special supervision. She said that the government tends to put people under this special supervision for the balance of the time. Basically, as you understand from this case, he was sentenced to 100 months in prison, and then there was, beyond that, 20 years of probation for his crimes here. She said that the government tends to place the person on this type of probation type of thing. But she also made it pretty clear that if people don't comply with the exit and reentry requirements of Uzbekistan, when they get back there, they're going to end up... So if I may, Your Honor... They're going to end up in prison. Well, first, you've got to get there, right? Right. I mean, I think it's highly questionable whether or not they'll ever even issue a travel document to this guy. And I'd be perfectly happy to discuss the travel document issue as well. I did speak to DHS about... Obviously, I'm government counsel. I can do that. But as far as the... Is that part of the record? It is not, Your Honor. I mean, because this is a petition for review of the removal order, you're not going to get all the questions about travel documents in here. That would be, as my colleague says, in the habeas context. That's not this type of case. As far as the... Where were we? You talked to the DHS. I'm sorry, not that. The exit and reentry. Exit and reentry interview. For one, the expert specifically testified that she did not speak to the petitioner or his mother. She read the I-213. She read some of the country reports. She read their declarations. And if you notice, Your Honor, the two fact witnesses, obviously, are Mr. Bamatov and his mother. Neither one of them testified that they left the country illegally. And in fact, they all pointed out... They left as refugees, right? They left as refugees, and they got a travel document from the government. The mother got a travel document on October 19, 2004. Would he have been a minor? He would have been a minor. He would have been a minor. So he left with his mom. So he left with his mother. And so the mother specifically said the only reason why she got the document, because she told the government that she was leaving. Ms. or the expert, she never spoke to any of these witnesses. She just went by what she read and she believed she read in the declaration from their I-213. And she specifically said her testimony was based on, I think they didn't have a document. At the time, she did not know that the mother actually did have a document. I believe that document appears at page 626 of the record. And if you look at the mother's declaration at page 602, she also mentions it. And as I said, Mr. Bamatov also said his mother left. But I believe in 2001, she tried to get a passport. Apparently, one was issued or something like that, but the government told her it was lost. And it took a while. She filed an application for a, I believe it was a lost passport. And all they gave her was this travel document that permitted her to leave. And she applied for refugee status in the country, obviously from the U.S. consulate, and left on that basis. But when she got to the United States, she didn't register with Uzbekistan. And so the only thing you get that from is from the expert's testimony. And I know that my colleague mentioned that in the brief. The problem with that, again, is that Mr. Bamatov or his mother never said that they didn't register when they came to the U.S. And in fact, in the brief, Petitioner specifically cites to, for that point, page 526 of the record. Well, it seems kind of odd, you know, that if they were seeking refugee in this country because of their religious beliefs, that they would get here and then go directly to the Uzbekistan consulate and register. Well, I mean, it would be nice if we knew that from the record. Yes, it would. Right? So the problem is, it's just not in the record. The expert is saying it, but factually, the evidence is not in this record. And so I know my colleague points to page 526 to say, look, you didn't follow the entry-exit thing. But if you notice page 526, it's referring to Article 23 of Uzbekistan's laws. That's about the passport laws. That's not about illegal entry and entering the country. And the law that is about the illegal reentry and to that effect is at page 529. But it says absolutely nothing about people needing to register in the country that they had gone to at the consulate or anything like that. And it certainly says nothing about stateless people. Well, when he goes back, he's clearly not going to have any documents that show that he properly left Uzbekistan. And so, obviously, the only thing that was... Because he wouldn't have been able to do that when he left. I mean, he was a minor, so he's not going to get it himself either. So he doesn't have anything going in when he... So when he returns, at most he would be returning with a travel document that DHS would have to procure in order for him to go. The United States just can't remove anyone just because we say that he should be going back to that country. The country needs to issue the travel document. So that's one thing that he's going to have to obtain to get back there. Upon getting there... But doesn't the government has to obtain... Our government has to obtain that document. Right. And so, I mean, the travel document is only relevant as to the government of Uzbekistan. We don't need it for our own purposes. We... The government of Uzbekistan, I imagine, wants it so that it can basically repatriate the person that is coming back to the country. And so... So you... Go ahead. I'm sorry. I'm sorry. And so as far as his being stateless, that's not a question in this case. The IJ specifically said that the person is likely to be treated as stateless, that the government is likely to find out about that. But there are 3,000 or more that the country reports indicate. I'm sure you've seen it in each of the 3 country reports that are in this record. Live peaceful... Or live in the country. I can't say one way or another that they live peacefully. But there's no evidence that such people are tortured, persecuted, or any... This is obviously a torture case, but that they are harmed in any way. In fact, the expert at the time, when asked on cross-examination by government counsel, specifically admitted that if the person had remained in the country, Mr. Bamatov, he would have been fined. So there's no evidence in this record of anyone similarly situated to Mr. Bamatov in particular. Criminal deportee, stateless, had applied for refugee status and... Or had obtained refugee status in the U.S. and a seventh-day Christian being harmed in the country. There's evidence of journalists, Muslim extremists, political opponents, human rights activists. Those type of people returning to the country and being placed in prison and harmed that way. But anyone in Mr. Bamatov's particular circumstances, petitioner has literally no evidence in this record that such people, upon returning to the country, are placed in prison and tortured. And so that's the key question here, whether they would be placed in prison. So you were going to mention a little bit, just as an aside, it's not in the record, but is the government likely to obtain a... And so I cannot say that definitively. What I did do is speak to the regional immigration officer who does deal with that particular region of the world as far as obtaining travel documents. And he said he sees no reason why they would not be able to obtain a travel document. And I see I've got a few seconds ticking down. What my colleague mentioned as far as during the immigration proceedings is DHS can't obtain a travel document unless you guys give us a removal order. I mean, it's not even a matter of being able to go to the Uzbek consulate and get the travel document. If we don't first have a travel document or, excuse me, a removal order, that starts the process. So in speaking to the officer, and I see my time is up, I'll say this quickly. In speaking to the officer last Thursday, he did say that we would at least get the ball rolling on getting all our documents together. There is a birth certificate in this record. And looking at the mothers and the fathers, mind you, the father was an Uzbek citizen at the time. I don't know why, in particular, the father didn't testify here, only the mother, who is from, I may butcher, Kyrgyzstan. But I don't know why the father didn't testify, or at least we didn't get some documentation about the father that potentially could have helped him obtaining documents in Uzbekistan. If there are no other questions, I will leave the motion to remand alone. Okay, no questions. Okay, Your Honor, for these reasons and the reasons that we state in the brief, we ask that you affirm the agency's decisions. Thank you. Your Honor, just to address a few points in the brief time I have remaining. Under Zad Vidas, he would be considered for release if his CAT case was granted. So he would have another opportunity to be considered for release. Be likely to be, you mean, released in this country? Yes, Your Honor. As after being convicted of raping and sodomizing a five-year-old?  The Supreme Court has found that no matter, a person can't be indefinitely detained in immigration detention forever. And that's sort of the basis for Zad Vidas versus Davis. But just to address a few points that my colleague mentioned. He is barred from raising this argument that the illegal exit didn't actually happen by SEC versus Chenery Court, which has been affirmed in this court in Hernandez-Cruz versus Holder. And it's important to note that the expert's credibility was never questioned by the agency. So in the absence of any rebutting evidence, her testimony should be accepted under Aguilar-Ramos as well. And also, my colleague mentioned that his statelessness and his status as a criminal deportee would subject him to these additional requirements. But it's very important to note that those are only if he escapes arrest and prosecution from being immediately apprehended at the airport, which the expert said it's a 99% chance that that's going to happen. So all of those other factors only come up if he's somehow able to evade that. And there was no evidence in the record, Your Honor, to support that finding that he would escape arrest and prosecution at the airport. So I'm out of time, but thank you, and we ask that you vacate the decision of the agency. Thank you. Thank you. Okay, we thank both counsel for their excellent arguments, and these are difficult cases. Fomentoff shall be submitted, and go on to the Ames case. But just for planning purposes of all those in the courtroom, after this Ames case is argued, the panel will take a 15-minute recess before the argument on Wilson.
judges: Gould, Paez, Jack